This call for argument is N. Ray, the Parentage of C.W.S. Excuse me, counsel, whenever you're ready, you may proceed. Your Honor, Donald L. Smith here on behalf of the appellant. Please be the court counsel for the appellant. You may proceed. The important matter we're looking at here is the custody of a minor baby. And to come up with the first question, why would an attorney appeal a custody determination when they're facing such language as comes out of the decisions and the statutes that says the appellant has the burden to show that the action was against the manifest way to the evidence or against a clear use of discretion. It's a substantial burden on the appellant. Obviously, I did not file this on behalf of my client here to drive down the burden and listen to ICLE on the way, which I did do, but I did file with the real intention and the true feeling and belief that the records in this case establish that there was not sufficient evidence to justify and giving custody of this baby to the father rather than the mother who I represented. I think the abuse is a very tough word, but again, I think and I realize the statute, which is, of course, 705 ICLE 602A, sets out approximately five standards, but that's not cut. It's stolen. And the courts have recognized those often and then go through them or what have you. But this one's a little bit different. This is a custody of a baby. This baby was born in November 2008. The baby was born in Maryville, Illinois at the hospital there. The baby was born to two young people who were not married, who had had some relationship for approximately three years and had problems and, in fact, were separated and not living together at the time it became known that the defendant's mother was pregnant. The decision was made that they would attempt to straighten this out and that's why they went back together and the baby was born in November 2008. At the time that the baby was born, which I think is a significant thing, the two parties were living in Highland, Illinois in an apartment. The father's home was Highland. His parents lived in Highland. The mother of my client's parents lived in Wharton, Illinois, approximately 25 miles apart from each other. The baby, after being born in November, was taken to the apartment approximately three days after birth. It appeared there was a condition, that there was a problem, so the baby was taken back to the Maryville Hospital. Again, the diagnosis was nothing serious. There was a problem. There was a problem, obviously, in the right shoulder of the baby and it had been a forced birth. They finally decided the best solution for this child was Children's Hospital in St. Louis, which was an absolute choice by all parties involved, because it turned out that the child had a brachial plexus. And what is a brachial plexus? Obviously, it was a torn situation in the shoulder, which would need medical attention, including an initial surgery right here at the beginning of the mother's soul. And the treatment thereafter is a physical therapy for this child to try to get movement in this right shoulder. The problem between these parties, and throughout this matter, has been not so much the items spelled out in the statute, but also the fact that there has been a showing of financial irresponsibility, which is not stated specifically in the statute, but there are many cases that say that this is something that should look at in stability, is the intent of the parties, because this decision that was made by this court is not what is happening now. They are making, that judge is making a decision as to the future of his child, at least up to 18 years of age. It can change, but still, that is what should be looked at, not as to what the situation is right now in that hearing. And the real factor we've got to look at, the real thing that's in our mind is, what's the best interest for this child? The child cannot make decisions as to who's to have custody or not have custody. We've got a child less than two years of age, 14 years of age at the time of trial. The child knows his parents. He knows them. They begin to recognize him, their mother, their father. But, and in this case, there was a guardian ad litem appointed by the court. In fact, the sequence was that this case was filed in February of 09, a GAO appointed in March of 09. The attorney for the appellate was not myself at that time. I showed up in about April of 09. And at that time, there had been various factors that occurred. This case was tried in February 18, 2010, and February 19. The order was ended on February the 26th. There had been two judges through the proceedings of this case when the date was filed. There was one judge in which there was temporary matters. The thing that had set me a great deal when I talked to my clients was what existed when I came into the case in May was previous to that, the parties were relying on the father who was working construction. His own testimony, his experience with construction work was from age 15, and he's now age 21. But, in the end of January or February, he was terminated. The construction work was gone. This baby was going to need serious surgery. So the question was how he was going to be paid for. He had insurance while he was working during November. Which covered the birth, but obviously the surgery was much later after that. The situation was he became unemployed. The situation was that the mother was unemployed but a member of the National Guard. There was compensation coming in somewhat. She was drawing unemployment. After he was terminated, he was to draw unemployment. But it was decided, but it was determined, that even though there was insurance available under COBRA, that the cost would have been way astronomical for the type of surgery and type of treatment necessary for this child that neither of these parties could afford. Luckily, the mother had medical insurance through the National Guard. At that time it was Missouri National Guard. So the first surgery in February was covered through the insurance through the National Guard, through the mother, and it cost a substantial children's hospital. The next question we get to is there was going to be a future surgery. It was going to be needed sometime later. Pending that, though, there was to be prison therapy. Now, this physical therapy was performed somewhat at the hospital, but then thereafter this physical therapy was performed in the home. The parties separated in the end of January, first of February, 2009, with the father going to his parents' home in Hyden and the mother going to her parents' home in Warren. The father made a decision at that time that he would not go out and look for additional employment. He would go to his parents' home, and that's where he was going to live. She was at her parents' home. In the early part of February, as this separation occurred, the parties were having substantial problems between themselves, and as I've already stated, they had been separated at the time they became aware she was pregnant. This problem was the fact that his parents were in Hyden where they were living, her parents were in Warren. The expression of the planet was they were becoming, there was animosity building up over the fact that it was a single-family type situation, his family, which was controlling the situation, including him, which was becoming very uncomfortable for her. This man was working construction when the baby was born up to February. To work construction, he left the home approximately 4 a.m. in the morning. The mother was a stay-at-home mother, though she had unemployment, taking care of this child from November, the date of birth, up through an order that was entered in May. For about seven months. This young lady, both of them were about 21 years of age, too. Very young couple. Great responsibility was placed on both of them. She had, luckily, the National Guard insurance. He decided that he did not look for employment, but that he was going to go to college. So he decided that the most convenient thing was to live with his parents, filed a petition, he went in custody of this child. Obviously, he had to take the child to his parents' home with him if he got custody. The college that he enrolled in was a junior college, had a two-year program, which his testimony is he was going to major in administration and justice because the available occupational construction was somewhat limited. And I agree. But the court can take judicial notice. Constantly, all we see on the television, the radio, and the newspaper is that Dyer not needy. He wanted to be a policeman. I did see in your brief you said we could take judicial notice of that, but you didn't cite any authority that indicated that, that we could take judicial notice of what was on the radio or the newspaper or something of that nature. Well, I think it's an everyday occurrence. I mean, I think it's the type of situation where I didn't cite any authority because it is common knowledge. It was common knowledge throughout the community. It was common knowledge throughout the whole United States, in fact, that many of the problems in the public government or what have you were severe, especially in Illinois. Are you saying that if he would have gone out and got a job in the evening as opposed to going to school that the court would have been justified in ruling this way? No. What I'm saying is this is a very strong situation that shows he had no intent to do that. And I don't think that gift he would have done that is relevant. I think what is relevant is he did not do it. So the fact he did not pursue a job is what you're relying on to say that her judgment was against the manifest way to the evidence? Primarily a stability that he did not show the stability of a real interest in that. In addition, and that would justify, but in addition, looking at the Guardian-Lawdon's report and looking at her order and hearing some of the matters she ruled on, that what she was looking at and what they were relying upon, they emphasized that he would have so much more time than the mother would have for this child, which they called a severe injury. And there is no medical testimony, there is nothing whatsoever that says this child, he did have an injury. But the term severe was never said in any place except by the petitioner and by the attorney for the petitioner and the court. Thank you, Counsel. Counsel. Thank you, Your Honors. May it please the Court. My name is Jennifer Shaw and I represent the athlete Corey Sully. This is a case that the trial court carefully reviewed the evidence before it, carefully reviewed the record before it, and determined that it was in the child's best interest that his custody be awarded to his father. I think it's very important that the court look at this particular child. This is not your typical custody case. This is a custody case of a disabled child, a significantly disabled child. Mr. Smith asserts, however, that there was no indication whatsoever that this was a significantly disabled child. I do not have the exact site to the record, but Mr. Smith in his direct examination of the child's therapist elicited testimony about the extent of the injury. And I believe that the record will show when you review that portion that his therapist talks about the fact that Colton, the child, his injury is one of the most significant brachial plexus injuries that she's seen. And so I do not believe that the record, I do believe the record supports that this child has a substantial injury. Accordingly, I think the most important factors, and I think the court and the guardian ad litem also found and ruled that the two most important factors under 602A are the ability to influence a good and positive relationship with the other parent, and the ability to promote stability under subsections 3 and 4 and 5, and the ability to promote healthy interaction and interrelationship of the child with his parent or parents, the child's adjustment to his home, school, and community, and the mental and physical health of all individuals involved. It is very clear that the trial court found that there was proper subject matter jurisdiction and personal jurisdiction, and in an application of those statutory factors found specifically, specifically found that the stability of this child is greater with his father. And I think that's very substantial. I think it's something that this court really needs to look at, because we are looking at the manifesto of the evidence. Nothing that we heard today from Mr. Smith is enough to disrupt a trial court's finding. It's very well settled in Illinois that courts are to give great preference to trial courts because they've had the opportunity to review the credibility, demeanor, and temperament of the witnesses, and that's extremely important in a custody case. The evidence is to be taken in the light that's favorable to the appellee. If the evidence permits multiple reasonable inferences, the reviewing court is to accept those inferences that support the finding that the trial court does. If the evidence does not clearly support either party, which I do not believe to be the case, and the case that are. However, assuming argument that this court were to find that, it is not against the manifesto of the evidence for the court to find. It is not against the manifesto of the evidence if the evidence does not clearly support either party. However, I believe that a review of this record will show that it is overwhelmingly clear that the parent best able to take care of his child was Mr. Salim. Overwhelmingly? Yes. You'd agree, wouldn't you, that both parents were found to be loving and caring of this child and wanted the best thing for the child? Absolutely. And it seems the evidence was fairly balanced on both sides. I would respectfully disagree. I don't blame you. I know you do. But this case could have gone either way. And if you had been on the other side, you would have the manifest way to the evidence burden and you would have a very difficult thing. That's exactly right. But when you look at the record, and I understand that most likely you haven't had the record, when you look at the record, and I allude to this in my brief, all of the testimony that we hear about this child's disability comes from the father. All of the information that we hear about the diagnosis of his injury comes from the father. All of the information that talks about the surgeries that he's had comes from his father.  and what has to happen in the future comes from his father. It was very clear, and the guardian of item also found, that it may not be a case of one parent being overwhelmed in better than another, but one parent doing it a little better than the other. I think it's also important to look at what happened when Amber had the child primarily. There was a very short period of time when Amber had this child most of the time. And in that time, she consistently denied requests for additional time. In fact, it necessitated going to court on a weekend when she was working at her National Guard job to have additional time for Colton to spend with his father. I think her behavior in that period of time is indicative of what would happen if she had been awarded custody. The trial court and the guardian of item both saw that she did not have the same ability to facilitate a relationship with the other parent. And I think in this case, and I think the GAL and the trial court both saw, that that was an overwhelmingly important factor given the nature of this child. Mr. Smith talks about a showing of financial irresponsibility. The GAL and the trial court both reviewed those facts. And I think what you have here is a father who, upon losing his job, determined that he needed to make a better future for himself and for his child. He testified to that. And he's maintained a straight A average. He's on the dean's list. He's moving forward. From the period of time that they separated until Ms. Brenton obtained her employment, they were on equal footing. They were both receiving unemployment. They were both residing with their parents. They were equal. My client chose to go back to school to attempt to better himself. Eventually Ms. Brenton was able to secure employment as well, but they were on equal footing for a substantial period of time. Mr. Smith wants it both ways. Mr. Smith wants... You're not saying one is favored over the other because he went to school and she went to work. It was both logical, good decisions you're saying. Or at least the court could make that determination. Absolutely. I don't think there was any financial malice or irresponsibility. These are children who had a child. They were 20, 21 years old when they had a child at a time when many kids that age are in school and are not in the ultimate career field. The court assessed each factor under 602 and made a finding. We had a guardian, Lida, who spent many hours interviewing both families and made a recommendation. The evidence in the record, when you review it, will show that the court's decision was not against the manifesto of the evidence. Accordingly, we are asking you to affirm the decision of the child court. Are there no other questions? I don't believe there are. Thank you, Your Honors. Counsel? Thank you. It's important to look at the fact that he decided that the best for the child was him. Not the lawyer. Not providing a financial responsibility. She provided the insurance. She arranged the therapy. She did this. Seven months she had him. She's a living mother. She's the mother of this child, showed this kind of interest and cared for the child. He went to work at 4 a.m. in the morning and got him on later leave. The important thing here is, what did she do then? She goes out. She switched from Missouri National Guard. L.A. National Guard also was able to acquire a job. They made a big deal that he's got this more time. As if to say, by her going to get a job, establishing financial responsibility for her and her child was a defect in her, was not a good thing for her to do. And to send her home as a parent, and not providing stability, financial or what have you, to the child other than going to his parents. And speaking of parents, five times the Guardian of Life talks about what all his mother can do and how she had all this great training, medical training, which turned out to be false. She's a clerk. She was not. She didn't have any medical special training. In addition, she... How did that come out? You do differ with the GLF, GAL, on what the mother's what. Didn't that come out in your examination of the mother during the trial? Yes. No. It didn't come out that way? How did it come out? He said, his report said... I know that's what his report said, but at least your understanding of what her current situation is came out through your cross-examination during the trial. So the court was fully aware of these things. Yes, but it just passed over. I mean, she made no note of that whatsoever. And that is a significant thing that this woman lied to the Guardian of Life. She said she was going to stop working. She didn't. She continued to work and was working four months later. You know, this is not... Again, this is a situation where the court did not understand. In addition, I brought up the point about I was not able to put on two weddings. They were not disclosed under 203. That's correct. Unfortunately. But the court obviously had never read 203 because it's not limited to say if you don't disclose them, they can't testify. You don't get the merits of the whole case. You're not to hold some kind of... not even ask for an inquiry into it. And the judges commented to me when I introduced the mother of the child and who she lives with now, who is her fiancé whom she's going to marry, where she's established a home, she's established a job. They made a big deal that says, well, he owns the house. What if they throw you out? Did you make an offer of proof as to what they would testify to? I couldn't. But it does no good. And there's cases on that when the judge looks you straight in the eye and says, there's nothing I can do. Did you disclose them? And her statement was as, I can do nothing about that. Well, how are we supposed to know if you were prejudiced if we don't know what they would testify to? When she says there's nothing we can do, there's no need for an offer of proof because she said she couldn't do anything no matter what I said in the offer of proof. Did you attempt to develop what they would have testified to in your other witness with the mother when she testified? And you did bring out... I did bring her back. You brought her back and testified as to what the mother may have testified to and what her friend or fiancé would have testified to. So the court did have an opportunity to consider what their testimony would have been. It was obvious that the court was paying in her actions, in her refusal to even recognize the rule of rule, the basis of 203, and not to say, forget it. You could well have a point there. You know, just forget it. You're not going to get it. They're not going to do it. I don't care what I do. You know, I was wasting my time right then and there. And the other thing is, it's just a... I think, let's look at the future of the child. Who had plans and who didn't? Who had substantial plans? Who had got their life straightened out? Who has a fiancé and a home? And they point out, well, she's not available. No, she's working. Oh, one thing I want to point out real quick. This child, when the physical therapist was talking about it, she was talking about the result of the injury to the shoulder. There is nothing discouraging. In fact, she said it's a well-developed child in every other way. The child was talking. The child was helping itself. The child, except in here, in the shoulder. We don't need a father sitting on his desk, watching the baby, instead of going out and worrying about his future in other ways, other than saying he's going to go to school at night for three nights. That's an abuse of authority by her not giving this child to the mother to take care of and to put him in. The child, this is today's world, what part of the world? Thank you. Thank you, counsel. We appreciate the briefs and arguments of counsel. We will take this case under advisement. Though we have other cases, they're not scheduled for oral argument. Therefore, the court is adjourned.